IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALAN L. MAPUATULI,<br><br>Defendant. | CR NO. 12-01301 DKW<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

Defendant Alan L. Mapuatuli is charged, in separate counts, with knowingly and intentionally distributing 50 grams or more of methamphetamine, knowingly and intentionally possessing with the intent to distribute 500 grams or more of methamphetamine, knowingly possessing a firearm in furtherance of a drug trafficking crime, and the unlawful possession of a firearm by a convicted felon. Mapuatuli moves to suppress certain post-arrest statements, methamphetamine and a firearm seized from a black bag and brown pouch found in the trunk of the vehicle he was driving at the time of his arrest, and evidence obtained from his two cellular phones found in the passenger compartment of the

same vehicle. Mapuatuli argues that the warrantless search of the vehicle violates the Fourth Amendment.

Following briefing and two evidentiary hearings, the Court upholds the validity of the vehicle search, which resulted in the seizure of the physical evidence on which the charges against Mapuatuli are based. Accordingly, the motion to suppress is DENIED.

## **BACKGROUND**

For six days prior to his arrest on December 17, 2012, Mapuatuli was the subject of a multi-agency investigation led by United States Immigration and Customs Enforcement Special Agent Ryan Faulkner ("SA Faulkner"). The investigation began on December 11, 2012 when a cooperating informant contacted SA Faulkner and advised that Mapuatuli had appeared unannounced at the informant's residence with four ounces of methamphetamine, and sought the informant's help in distributing it. The informant declined to provide the requested assistance at that time.

Three days later, Mapuatuli returned, once again asking for the informant's assistance to distribute "ice." According to SA Faulkner's investigation report of what was communicated to him,

> MAPUATULI . . . removed from a black colored small backpack what appeared to be a one (1) pound quantity of "ice," and asked if [the informant] could move it for him. [The informant] declined MAPUATULI's offer, stating that in a few

> days he/she would be able to assist him. MAPUATULI informed [the informant] that he was trying to get back to California, and that he had approximately six (6) pounds of "ice" left, and asked if [the informant] would be able to assist him with the distribution of the remaining product. Upon conclusion of this conversation, MAPUATULI left the apartment with the "ice."

Def. Ex. C at 13.

On December 15, 2012, Mapuatuli and the informant began an exchange of several text messages that were monitored by SA Faulkner and his investigation team. Govt. Exs. 100–112. These text messages renewed Mapuatuli's requests for help in distributing "ice" and, for the first time, the informant gave a positive response. *Id*. at 100-103. Over the subsequent two days, Mapuatuli and the informant, continuing their communications via text messaging, negotiated the quantity, price and profit take associated with the informant's prospective sale of "ice" on Mapuatuli's behalf. *Id*. at 103-111. On December 17, they agreed to meet. *Id*. at 111-112.

During the afternoon of December 17, 2012, SA Faulkner held an operational briefing regarding the transfer of "ice" that was expected to occur that evening between Mapuatuli and the informant. At the briefing were, among others, SA Faulkner, Drug Enforcement Agency Officers, and two Honolulu Police Department officers (Detective Darren Nihei and Officer Bronson Liana) assigned to the Department of Homeland Security Task Force. SA Faulkner presented the

information the team had accumulated to that point on Mapuatuli, circulated a photograph for identification purposes, and described the communications that had occurred with the informant leading up to the informant's anticipated meeting with Mapuatuli that evening:

> SA Faulkner informed the surveillance and security team that [the informant] was planning to meet with MAPUATULI at the KFC located at the corner of Keeaumoku Street/Kapiolani Boulevard in Honolulu, Hawaii, and it was believed that MAPUATULI would likely "front" [the informant] a one (1) pound quantity of "ice." . . . During the briefing, SA Faulkner informed the security and surveillance team that intelligence had been gathered that MAPUATULI was currently operating a black colored Ford sedan . . . Database checks revealed that the vehicle was being rented [by] the Hertz Corporation. This vehicle had been reported as an Overdue Rental under HPD report 12-456646. Further database checks revealed that according to the State of California, MAPUATULI's driver's license had expired in 2004. Additional intelligence indicated that MAPUATULI was likely armed with a handgun.

Def. Ex. C at 16. The team also discussed the details of the surveillance of Mapuatuli's vehicle that would be needed once the meeting between Mapuatuli and the informant concluded. Specifically, the team agreed that Detective Nihei and Officer Liana would be in HPD uniform driving a marked HPD vehicle. If there was probable cause to believe that Mapuatuli still had contraband in his possession following the meeting with the informant, Nihei and Liana would be responsible for stopping Mapuatuli's vehicle.

4

Following the team's operational briefing, the informant placed a law enforcement-monitored call to Mapuatuli, and arranged to meet at the Ala Moana KFC near the informant's Century Center apartment.  Law enforcement wired the informant, enabling SA Faulkner to audibly monitor the meeting between the informant and Mapuatuli.  That evening, as planned, Mapuatuli and the informant met at the designated KFC.  After making a brief stop at a nearby Don Quijote store, SA Faulkner observed Mapuatuli driving himself and the informant in a black Ford sedan to a gravel lot near the informant's apartment.  There, Mapuatuli parked the car and accompanied the informant into the lobby of the informant's apartment building.

SA Faulkner monitored the meeting from a car parked outside the building.  Through the recording device, SA Faulkner heard Mapuatuli and the informant enter a unit in the apartment building, and then what SA Faulkner believed to be the pouring of a substance from one bag to another.  Within approximately five minutes, SA Faulkner observed Mapuatuli leave the informant's building alone, and approach the parked black Ford sedan carrying a black colored small backpack on his shoulder.  SA Faulkner further observed Mapuatuli open and close the Ford's trunk, and enter the driver's side of the vehicle without any visible possessions.

Detective Nihei and Officer Liana, also parked near the informant's apartment building, similarly observed Mapuatuli leave the building carrying a bag, and watched as they saw Mapuatuli exit the parking lot in the Ford. As Mapuatuli drove away, Detective Nihei and Officer Liana followed, keeping a safe distance away in their marked vehicle, while allowing other team members in unmarked vehicles to more closely observe.

At the same time, shortly after Mapuatuli's departure from the apartment building, the informant met with SA Faulkner, describing the following details of the meeting with Mapuatuli:

> [The informant] turned over a bag [to SA Faulkner], stating that it contained two plastic bags. Each plastic bag contained an eight (8) ounce quantity of a white crystalline substance containing what appeared to be "ice." [The informant] informed agents that upon entering the gravel parking lot, MAPUATULI opened the trunk of the vehicle, and removed a black colored small backpack, along with a brown zippered pouch. MAPUATULI then followed [the informant] up to the apartment unit, and entered. MAPUATULI was then observed removing a plastic bag containing what appeared to be a pound of "ice," and placed a half pound quantity of the "ice" into two smaller bags (MAPUATULI did not use a scale for this process). [The informant] observed an additional pound of "ice" in the same brown pouch. MAPUATULI did not remove anything from the small black backpack, but had it with him during the entire transaction.

Def. Ex. C at 19. The informant turned over to SA Faulkner the approximately one pound quantity of "ice" in two plastic bags that the informant had received from Mapuatuli and was instructed to return to his/her apartment.

6

SA Faulkner then radioed Detective Nihei and Officer Liana. SA Faulkner instructed the HPD officers to initiate a traffic stop once it was safe to do so and once they observed a traffic violation. It was Detective Nihei's understanding, as a result of the operational briefing, that this instruction indicated that Mapuatuli had contraband in his possession. The HPD officers caught up with Mapuatuli's black Ford, west bound on H-1 near the School Street exit. They observed Mapuatuli cut across two lanes without a signal at the top of the exit, and initiated the traffic stop requested by SA Faulkner.

At the traffic stop, Mapuatuli admitted that he did not have a driver's license in his possession. The officers confirmed with dispatch that Mapuatuli did not have a Hawaiʻi driver's license, his California driver's license expired in 2004, and the car he was driving was an overdue rental. Mapuatuli was then arrested for driving without a license, handcuffed and placed in the back of Liana's HPD vehicle. Nihei then called SA Faulkner, who instructed the Detective to ask Mapuatuli if he claimed ownership to anything in the car, and to specifically show Mapuatuli each item in the car so that he could claim or disavow ownership. Mapuatuli responded that two cellular telephones and a bag of food from KFC in the passenger area of the Ford belonged to him, but disclaimed ownership of anything else in the vehicle. Among those items of which Mapuatuli disclaimed

7

ownership following presentation by Nihei were a black bag and brown pouch found by the officers in the trunk of the Ford.

Mapuatuli, and the Ford, were transported to the Kalihi Police Station for processing.[1] There, SA Faulkner searched the black bag and found, among other things, a loaded Kimber .45 caliber pistol, approximately 170 grams of methamphetamine, and $15,975 in cash. SA Faulkner discovered an additional 476 grams of methamphetamine in the brown pouch. *See* Govt. Exs. 113–122 (photos of the bag, pouch and their contents).

## DISCUSSION

As a threshold matter, the Government concedes that Mapuatuli has standing to contest the search of the Ford. Dkt. No. 69. The Government has also represented that it will not offer into evidence any information obtained as a result of the search of Mapuatuli's cellular telephones. Thus, those aspects of the motion

---

[1] At the second evidentiary hearing on April 25, 2014, Mapuatuli emphasized a discrepancy between SA Faulkner's testimony and the reports drafted by SA Faulkner contemporaneous to the arrest. The discrepancy involves which car carried the black bag and brown pouch from the scene of the arrest to the Kalihi Police Station where they were searched. SA Faulkner testified at the hearing that after Detective Nihei questioned Mapuatuli regarding his ownership of the bag and pouch, the bag and pouch were placed back into the trunk of the Ford and taken to the station in that car. This account was corroborated by the testimony of both Detective Nihei and Officer Liana. However, in his sworn affidavit, dated December 18, 2012, in support of the criminal complaint, SA Faulkner represented that the "bags were placed in the trunk of the marked police vehicle" and not returned to the rental car. Def. Ex. A ¶ 10. SA Faulkner's investigation report similarly stated that "[t]he contents of the [Ford] were secured and transported [to the Kalihi Police Station] in the trunk of the marked police vehicle." Def. Ex. B at 4. When questioned on this discrepancy at the hearing, SA Faulkner testified that his written documents were incorrect and, in fact, the bag and pouch were returned to the trunk of the Ford before SA Faulkner drove the Ford to the police station. Regardless, as discussed further in footnote 2 below, this discrepancy is immaterial and does not affect the Court's determination of probable cause.

to suppress are moot. The remaining question is whether there was probable cause to search the contents of the black bag and brown pouch. The Court determines that question in the affirmative.

The Government argues that under the automobile exception to the Fourth Amendment's warrant requirement, the search of the black Ford and, specifically, the search of the brown pouch and black bag found in the Ford's trunk, was reasonable. Mapuatuli counters that the automobile exception only applies if the police had probable cause to search the entire vehicle, and not just a particular container within the vehicle, based on the Ninth Circuit's holding in *United States v. Salazar*, 805 F.2d 1394, 1397 (9th Cir. 1986), overruling recognized by *United States v. Sanchez*, 944 F.2d 497, 498 (9th Cir. 1991) and by *United States v. Lopez-Angulo*, 1992 WL 289534, at *1 (9th Cir. Oct. 15, 1992) (unpublished). Thus, Mapuatuli argues, because law enforcement was focused on the black bag and brown pouch specifically, there was no probable cause to search the whole vehicle, and particularly the vehicle's trunk, where the black bag and brown pouch were ultimately found.

Mapuatuli's arguments, however, are without merit because *Salazar* is no longer the governing law. In *Salazar*, the Ninth Circuit held that the automobile exception to the warrant requirement "applies only if the police had probable cause to search the entire vehicle, rather than [a container within the vehicle]." 805 F.2d

9

at 1397. Thus, "[w]here, prior to a search, officers have probable cause to believe that a specific closed container holds contraband, . . . they must obtain a search warrant before opening it, even though it is located in an automobile." *Id.* This rule was based on a distinction "between searches of containers found in a car based upon probable cause that a specific container placed in a car contains contraband, and searches based upon a generalized belief that a car contains contraband somewhere inside." *Id.*

In *California v. Acevedo,* 500 U.S. 565, 579–580 (1991), however, the Supreme Court voided that distinction:

> Until today, this Court has drawn a curious line between the search of an automobile that coincidentally turns up a container and the search of a container that coincidentally turns up in an automobile. The protections of the Fourth Amendment must not turn on such coincidences. We therefore interpret *Carroll* as providing one rule to govern all automobile searches. The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.

500 U.S. at 580. Applying that rule to the specific facts in *Acevedo*, the Court concluded:

> In the case before us, the police had probable cause to believe that the paper bag in the automobile's trunk contained marijuana. That probable cause now allows a warrantless search of the paper bag. The facts in the record reveal that the police did not have probable cause to believe that contraband was hidden in any other part of the automobile and a search of the entire vehicle would have been without probable cause and unreasonable under the Fourth Amendment.

10

*Id.*

The rule in *Acevedo*, not *Salazar*, must govern the Court's analysis here. *See Lopez-Angulo*, 1992 WL 289534, at *1 (9th Cir. Oct. 15, 1992) (unpublished) (recognizing that *Acevedo* overruled *Salazar* and thus concluding that there was probable cause under the automobile exception to search a suitcase located in the bed of a pickup truck). So long as law enforcement had probable cause to search the black bag and brown pouch, the search of those bags in the trunk of the Ford was constitutionally permissible under the automobile exception. The Court concludes that such probable cause existed for the reasons that follow.

I.  **Probable Cause to Search the Brown Pouch**

"Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed, and that evidence bearing on that offense will be found in the place to be searched." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 369 (2009) (internal quotation marks, brackets and citations omitted); *see United State v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) ("'Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair

probability that [the defendant] had committed a crime.'" (quoting *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)) (alteration in original)).

Probable cause existed to justify the search of the brown pouch. The informant specifically informed SA Faulkner after the December 17 meeting with Mapuatuli that Mapuatuli removed a black bag and a brown pouch from the trunk of the black Ford and carried them up to the informant's apartment. The informant further stated that the one pound of methamphetamine that Mapuatuli fronted, and which the informant subsequently turned over to SA Faulkner, came from the brown pouch. The informant also admitted to seeing an additional significant quantity of methamphetamine that remained in the brown pouch when Mapuatuli left the apartment. Mapuatuli has not offered any evidence to suggest that the informant did not communicate this information to SA Faulkner or that the informant was not reliable. The Court also finds credible SA Faulkner's account of the salient information communicated to him by the informant as to the existence and likely contents of the brown pouch.[2]

---

[2] As discussed above in footnote 1, the Government admits to an error in its written documents relating to which vehicle transported the brown pouch and black bag from the scene of Mapuatuli's arrest to the Kalihi Police Station. Based solely on this one admitted error, Mapuatuli argues that SA Faulkner is inherently unreliable and that all of his probable cause-related testimony should be disregarded. Mapuatuli, however, has provided no evidence to question the information provided to SA Faulkner by the informant both in the days leading up to the arrest, and following the meeting between Mapuatuli and the informant. Those salient facts evidence probable cause. Moreover, Mapuatuli provided no argument as to why it even mattered which car carried the bag and pouch from the scene of the arrest to the police station. In short,

12

Further, although no law enforcement witness actually saw Mapuatuli place the brown pouch in the trunk of the Ford after leaving the informant's apartment building, SA Faulkner did see Mapuatuli carrying a black bag out of the apartment, which Mapuatuli was no longer carrying after he opened and closed the Ford's trunk. Thus, it was reasonable for SA Faulkner to have concluded that whatever methamphetamine Mapuatuli was still carrying (which the informant stated that he/she saw Mapuatuli leave with) was placed in the trunk of the black Ford, and, based on the informant's statement, it was also plainly reasonable for SA Faulkner to believe that the methamphetamine was contained in a brown pouch.

Although SA Faulkner was the individual who actually searched the contents of the brown pouch at the Kalihi Police Station, there was reasonable suspicion on the part the investigation team to justify the search. "Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment." *United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007).

---

there is no logical reason to ignore the clear evidence of cause based on one readily admitted error on a questionably relevant point, and the Court declines to do so.

All of the information discussed above regarding the brown pouch and its contents was either observed by or communicated to SA Faulkner. In turn, SA Faulkner directed that Detective Nihei and Officer Liana stop the vehicle operated by Mapuatuli to seize the methamphetamine believed to be in the car. Detective Nihei and Officer Liana were present at the operational briefing held earlier that afternoon and were fully informed as to Mapuatuli's background, recent history, and the purpose of the operation. Specifically, the officers understood the purpose of the vehicle stop if they were directed to initiate one; that is, one would be ordered if SA Faulkner had a reasonable suspicion that Mapuatuli had additional methamphetamine on his person or in the car. Therefore, regardless of which of the three aforementioned members of the investigation team seized the brown pouch, any one of them had probable cause to search it based on the communications between team members. *Id.*

## II. <u>Probable Cause to Search the Black Bag</u>

Similarly, there was probable cause to search the black bag found in the Ford's trunk. At the December 17 meeting between Mapuatuli and the informant, Mapuatuli took the black bag (and the brown pouch) out of the trunk of the black Ford and carried it up to the informant's apartment in order to complete the drug transfer. Although the informant told SA Faulkner that Mapuatuli did not

open the black bag during the meeting, there was probable cause to search the black bag for at least two reasons.

First, the informant had previously communicated to SA Faulkner that Mapuatuli had carried and removed methamphetamine from a "black colored small backpack" when Mapuatuli met with the informant at the informant's apartment on December 14, three days before Mapuatuli's arrest. Def. Ex. C at 13. Based on the description given by the informant from that previous meeting, law enforcement held a reasonable belief that Mapuatuli would have a black bag on December 17 containing methamphetamine. Thus, there was probable cause to search the black bag found in the trunk on December 17, a bag which matched the description of the bag the informant saw on December 14.

Second, on December 17, Mapuatuli made a conscious effort to ensure that the black bag was on his person when he left his car and went to the informant's apartment for purposes of the drug transfer. The informant described to SA Faulkner that Mapuatuli took both the black bag and the brown pouch out of the trunk and followed the informant to the apartment. Although Mapuatuli did not open the black bag while in the informant's apartment, the whole purpose of the meeting in the apartment (which lasted only about five minutes) was to transfer the methamphetamine to the informant. When Mapuatuli returned to the car after the meeting, SA Faulkner observed Mapuatuli carrying the black bag, which he

15

deposited in the trunk. Based on the information from the informant that a drug transfer had taken place, and because Mapuatuli purposefully chose to bring the black bag along with him to the drug transfer meeting, it was reasonable to believe that the black bag contained contraband, including items that Mapuatuli might need to effect the transfer.

As noted above, Mapuatuli has offered no evidence to question the veracity of the informant's statements to SA Faulkner about either the brown pouch or the black bag, and the Court determines that SA Faulkner's testimony and investigation reports are both credible and reliable as to the relevant facts supporting a determination of probable cause. Accordingly, there was probable cause to search the brown pouch and the black bag found in the trunk of the black Ford driven by Mapuatuli at the time of his arrest, and, consequently, the search of those bags was reasonable under the Fourth Amendment. *Acevedo*, 500 U.S. at 580.

## **CONCLUSION**

Defendant Mapuatuli's motion to suppress is hereby DENIED.[3]

IT IS SO ORDERED.

DATED: May 2, 2014 at Honolulu, Hawai'i.

Derrick K. Watson
United States District Judge

---

United States v. Mapuatuli; CR 13-01301 DKW; ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

---

[3]The Court does not reach the Government's abandonment theory because probable cause entitles the Government to the fruits of their December 17, 2012 search regardless of Mapuatuli's statements. As a result, Mapuatuli's motion to suppress his abandonment-related statements is denied as moot.